UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-20150-CR-BLOOM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ADAM GINO JAMES COTTE,

    Defendant.
_____/

## **SENTENCING MEMORANDUM**

The Defendant, Adam Gino James Cotte, through undersigned counsel, submits this sentencing memorandum in connection with his sentencing on March 12, 2025. On October 29, 2024, Mr. Cotte pled guilty to one count of attempted production of child pornography, 18 U.S.C. § 2251(a) and (e). Presentence Investigation Report dated February 11, 2025 (PSR) at ¶ 1. He is subject to a mandatory minimum sentence of 25 years. PSR ¶ 95. The parties have agreed he should be sentenced to at least 25 years of supervised release. PSR ¶ 7.

Prior to the instant offense, Mr. Cotte had never served more than a few months in prison or received reliable access to sex offender treatment. A 25-year sentence ensures that Mr. Cotte will be adequately punished for the instant offense and receive the treatment he needs. Sentencing him to an additional 25 years of supervision ensures the safety of the community by requiring that the U.S. Probation Office closely monitor his reentry and participation in sex offender treatment.

For all these reasons, and those set forth below, the defense submits that a sentence of 25 years followed by 25 years of supervised release is sufficient to satisfy the purposes of punishment.

## **Mr. Cotte's History and Characteristics**

Mr. Cotte is 36 years old. He was born in Utica, Illinois on September 21, 1988. Mr. Cotte lived with his biological parents, Francine and Eugene James Denton, until he was about four years old. PSR ¶ 53. Mr. Cotte remembers little about his life with his biological parents, but recalls that they were extremely poor and subjected him and his siblings to abuse and neglect. *Id.* Mr. Cotte was told he was removed from their custody because his biological father sexually abused one of his older siblings. Thereafter, Mr. Cotte and his biological siblings were placed in different foster homes. *Id.*

There is no evidence that Mr. Cotte's biological parents or any of their relatives ever tried to take him out of foster care or assume his custody. Mr. Cotte's placement in foster care at such a young age caused him to feel a deep sense of loss, rejection, and mistrust that he has never been able to overcome. For most of his childhood, Mr. Cotte was depressed and withdrawn because of his belief that he was unwanted and without a "real" family.

These early feelings of desperation did not subside after Mr. Cotte was adopted by Richard and Marsha Cotte when he was seven. PSR ¶ 56. Mr. Cotte's past trauma and adverse childhood experiences caused him to act out in school and struggle to keep up academically. His adoptive parents were not equipped to handle his burgeoning emotional and mental health issues. They tried to discipline him with violent physical abuse and harsh words. Even after Mr. Cotte was diagnosed with mental health issues and medicated at a young age, PSR ¶ 65, they continued to treat him as a "problem child" and told him they regretted adopting him. This solidified his belief that he was less worthy than his adoptive siblings, an older brother with cerebral palsy and a sister about ten years older than him.

Mr. Cotte's adoptive sister frequently subjected him to verbal and sexual abuse. Whenever

her parents were not around, she inappropriately touched him, sometimes smacking his private parts, and made sexual comments towards him. PSR ¶ 56. As a result, Mr. Cotte never felt safe in his home and dreaded being left alone with her, which his adoptive parents often did. He once tried to tell his adoptive parents of the abuse but they did not believe him and angrily accused him of lying. Even though the abuse persisted for years, Mr. Cotte never again tried to tell anyone for fear that his adoptive parents might decide to put him back in foster care.

The abuse finally ended when Mr. Cotte was about 13 years old and his adoptive parents divorced. He remained living with this adoptive mother and brother, while his sister went to live with his adoptive father. During the following years, Mr. Cotte continued to struggle emotionally and academically. In high school, he was given an Individualized Education Program (IEP) after being diagnosed as emotionally disturbed and learning disabled. During these years, Mr. Cotte always felt like a burden to his adoptive mother who often complained about having to financially support and care for him and his adoptive brother on her own.

After graduating high school in 2007, Mr. Cotte left his adoptive home to participate in Job Corps in Joliet, Illinois. The program offers housing, career training, and education for low-income students. Her remained in the program for about two years and then started working entry-level jobs, mostly in restaurants. The money Mr. Cotte made was not enough to allow him to rent an apartment on his own. As a result, Mr. Cotte went back to Ohio in 2011, at the age of 23, to try to live with his adoptive mother.

Mr. Cotte's mother forced him to leave a few months later after telling him he was no longer welcome in her home. For the next few years, Mr. Cotte lived in men's shelters and tried to see if he could find a more stable life in other states, like Alabama and South Carolina. *See* PSR ¶ 58. He did not succeed and returned to Ohio.

In 2012, Mr. Cotte began a relationship with Cassandra Rose Tuttle and quickly moved in with her and her mother because he was homeless. They married in 2015 and had a daughter. Mr. Cotte tried to support his young family by working multiple jobs at fast-food restaurants like Panera and McDonalds. *See* PSR ¶ 87. His relationship with Cassandra was extremely volatile. *See* PSR ¶ 57. Cassandra and her mother often belittled Mr. Cotte for working in fast food restaurants and for not being able to afford to move the family out of his mother-in-law's home. Mr. Cotte stayed in the relationship because he had nowhere else to go.

It was during this time that Mr. Cotte began spending extended periods of time online talking to strangers. The time he spent online was his only escape from his troubled personal life and deep feelings of shame and insecurity. He spent hours a day in adult fantasy chat rooms and frequently found himself chasing extreme and inappropriate sexual experiences online.

This online activity led to his first arrest ever in 2019. Mr. Cotte and Cassandra separated after the arrest and later divorced in 2020. Cassandra told him she hoped he would die in prison and told him never to contact her or their daughter again. Mr. Cotte has not had any contact with his ex-wife or daughter since.

After his release from prison in 2021, Mr. Cotte was homeless and living in a men's shelter. PSR ¶ 58. He remained at the shelter until his arrest for another offense in Ohio in 2023. While Mr. Cotte received some mental health treatment during those years and was a registered sex offender, he only received a handful of sessions of sex offender treatment.

After his incarceration for the instant offense, Mr. Cotte was diagnosed with an anxiety disorder and prescribed a generic form of Prozac. PSR ¶ 72, 78. He has also experienced thoughts of suicide and been subjected to multiple suicide risk assessments. PSR ¶ 74–75. He has experienced intense feelings of shame, disgust, and remorse for his offense conduct.

### Mr. Cotte's Criminal History and Offense Conduct

On November 27, 2019, Mr. Cotte was charged with Illegal Use of Minor in Nudity Oriented Material in Montgomery County, Ohio. PSR ¶ 45. He pled guilty in February of 2020 and was sentenced to 11 months in prison. He was also required to register as a sex offender.

On April 12, 2023, Mr. Cotte was arrested and charged with attempted rape, importuning, and disseminating harmful matter to juveniles in Cuyahoga County, Ohio after chatting online with someone posing as a minor. PSR ¶ 46. On November 1, 2023, he pled guilty to all of the charges filed against him and was sentenced to three to four and a half years in prison with five years of post-release control and the requirement that he register as a sex offender. Mr. Cotte had served approximately one year of this sentence when he was transferred to federal custody for the instant offense. As a result, he must still serve two to three and a half years in an Ohio prison after his sentence in the instant case is complete.

On April 11, 2024, an Indictment was filed in the instant matter charging Mr. Cotte with attempted production and receipt of child pornography on August 8, 2022. PSR ¶ 21. Evidence provided in discovery shows the FBI began investigating the instant offense in September of 2022 after receiving a call from the victim's mother. Thereafter, the FBI reviewed the victim's devices and discovered she sent three explicit photos to an individual she identified in an interview as "Adam." The FBI identified Mr. Cotte as the person she shared these images with using his phone number and Snapchat information. The FBI located Mr. Cotte at a men's shelter on December 12, 2022 and obtained two of his cell phones pursuant to a search warrant.

The FBI did not arrest Mr. Cotte at the time of the search warrant and allowed him to remain at liberty with unfettered access to the internet, even though the FBI was aware of the instant offense and his prior Ohio conviction involving child pornography. A few months later,

5

Mr. Cotte was arrested for the abovementioned April 2023 offense in Cuyahoga County. An FBI report dated September 19, 2023, shows the FBI was aware of Mr. Cotte's arrest in Ohio and was monitoring his case. Mr. Cotte was not arrested and indicted for the instant 2022 offense until about five months after his Ohio conviction became final.

### Objections to Proposed Supervised Release Conditions

The defense objects to the following recommended special conditions of supervised release. "In sentencing a defendant, the district court may impose any condition of supervised release that (a) 'is reasonably related' to the history and characteristics of the defendant and the sentencing goals of deterrence, protection of the public, and rehabilitation; (b) 'involves no greater deprivation of liberty than is reasonably necessary' to accomplish those goals; and (c) is consistent with the Sentencing Commission's policy statements." *United States v. Harvey*, No. 23-10413, 2023 WL 8112999, at *2 (11th Cir. Nov. 22, 2023) (quoting 18 U.S.C. § 3583(d)(1)–(3)).

The defense objects to the conditions listed in paragraphs 132 and 133 of the PSR prohibiting Mr. Cotte from using a computer and computer modem. These conditions effectively prohibit Mr. Cotte from ever using a computer, smart phone, email, and the internet. This would make Mr. Cotte's successful reentry into society extraordinarily difficult as access to computers and the internet are necessary for finding housing and jobs, applying for benefits, and insurance, setting up bank accounts, and myriad other activities. Furthermore, imposing these conditions results in a greater deprivation of liberty than is reasonably necessary given that the Adam Walsh Search Condition, PSR ¶ 140, already allow for unfettered computer searches and the installation of software or hardware to monitor Mr. Cotte's computer use.

The defense objects to the conditions contained in paragraphs 134 (Employer Computer Restriction Disclosure), 142 (Relinquishment of Licensure), and 145 (No New Debt Restrictions)

as they involve deprivations of liberty that are not related to Mr. Cotte's history and characteristics or necessary to satisfy the goals of punishment.

Finally, the defense objects to the restrictions in paragraph 139 involving "adults engaged in sexually explicit conduct" as there is nothing in the record before this Court that warrants restrictions regarding legal pornography involving adults. *See Harvey*, 2023 WL 8112999, at *2 (ruling "the district court abused its discretion in imposing the adult-pornography special condition. Apart from Harvey's commission of child enticement in 1997, the court did not suggest there was anything particular about Harvey's history and characteristics that warranted prohibiting his possession of legal pornography involving adults").

### **Conclusion**

For all these reasons, the defense requests that the Court impose a sentence of 25 years imprisonment followed by 25 years of supervised release. The defense also reserves the right to supplement this memorandum after the disclosure of the final PSR.
.

                         HECTOR A. DOPICO
                         FEDERAL PUBLIC DEFENDER

                         By:   */s/Leticia M. Olivera*
                         Leticia M. Olivera
                         Assistant Federal Public Defender
                         Special A. No.: A5503215
                         150 W. Flagler Street, Suite 1700
                         Miami, Florida  33130
                         Tel:  305-530-7000
                         E-Mail Address: Leticia_olivera@fd.org

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on March 7, 2025, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

                                                                                   /s/Leticia M. Olivera  
                                                                                   Leticia M. Olivera